MARC R. THOMPSON
PULVERS, PULVERS & THOMPSON, LLP
950 Third Avenue 11th Floor
New York, NY 10022-2775
Attorney for Plaintiff
TEL: (212) 355-8000 / FAX: (212) 355-9000
mthompson@pulversthompson.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
| | |
|---|---|
| COLLEEN M. DELANEY, | ) |
| | ) |
| | ) |
| ***Plaintiff*** | ) |
| | ) Docket No. |
| ***-against-*** | ) |
| | ) **JURY DEMANDED** |
| THOMAS FORTUNE FAY, FAY LAW | ) |
| GROUP, PA, STEVEN R. PERLES, | ) |
| PERLES LAW FIRM, P.C., ALLEN L. | ) |
| ROTHENBERG, and THE ROTHENBERG | ) |
| LAW FIRM, LLP, FAY and  PERLES FSIA | ) |
| LITIGATION PARTNERSHIP | ) |
| | ) |
| ***Defendants*** | ) |
| | ) |
-------------------------------------------------------- x

### PRELIMINARY STATEMENT

Plaintiff COLLEEN M. DELANEY by her attorneys PULVERS PULVERS &

THOMPSON, LLP, by way of Complaint against THOMAS FORTUNE FAY, FAY

LAW GROUP, PA, STEVEN R. PERLES, PERLES LAW FIRM, P.C., ALLEN L.

ROTHENBERG and THE ROTHENBERG LAW FIRM, LLP alleges as follows:

### PRELIMINARY STATEMENT

1.       This is an action in which plaintiff  COLLEEN DELANEY ("Delaney"),

an attorney, seeks to enforce a 2001 oral contract with co-counsel defendants for her share

1

of attorney's fees paid to the defendants on a contingent basis that Plaintiff earned for performing indispensable legal work including client referrals and other legal services that led to one of the most successful civil cases ever brought on behalf of victims of state-sponsored terrorism: *Peterson v. Islamic Republic of Iran*, Case Nos. 01-cv-2094 (RCL), an action commenced by victims and their relatives for damages arising from the 1983 bombing of the U.S. Marine Barracks against the Islamic Republic of Iran.

2.      Plaintiff was promised a share equal to one-third of the legal fees based on the usual custom and practice in personal injury litigation estimated to be at least $53.4 million for the Peterson case.

3.      Despite the fact that Plaintiff fulfilled all of her responsibilities in 2001, once funds became available to pay legal fees, defendants repudiated their payment obligations to Plaintiff.

## PARTIES

4.      Plaintiff COLLEEN DELANEY is an attorney admitted to practice law in New York and Rhode Island and is a citizen of New York.

5.      Defendant THOMAS FORTUNE FAY is an attorney admitted to practice Law in the District of Columbia and is a citizen of Maryland. Fay is responsible to debts incurred by Fay & Perles.

6.      FAY LAW GROUP, P.A. (f/n/a/ Fay Kaplan Law, P.A.) is a professional association whose principal is Fay providing legal services organized and existing under and by virtue of the laws of the District of Columbia. Fay Law Group is a successor to and is responsible for debts incurred by Fay & Perles.

7.     THOMAS FORTUNE FAY is the principal of FAY LAW GROUP, P.A.

8.     STEVEN R. PERLES is an attorney admitted to practice in the District of Columbia and is a citizen of the District of Columbia.

9.     PERLES LAW FIRM, P.C. is a professional corporation whose principal is Perles providing legal services organized and existing under and by virtue of the laws of the District of Columbia. Perles Law Firm is a successor to and is responsible for debts incurred by Fay & Perles.

10.    STEVEN R. PERLES is the principal of PERLES LAW FIRM, P.C.

11.    ALLEN L. ROTHENBERG is an attorney admitted to practice in the State of Pennsylvania and The District of Columbia, and is a citizen of Pennsylvania

12.    THE ROTHENBERG LAW FIRM, LLP is a professional limited liability partnership whose principal is Allen Rothenberg providing legal services organized and existing under and by virtue of the laws of the State of Pennsylvania

13.    FAY AND PERLES FSIA LITIGATION PARTNERSHIP (f/n/a Fay & Perles Law Firm) is a partnership and or joint venture created by THOMAS FORTUNE FAY and STEVEN R. PERLES for the sole purpose of prosecuting a lawsuits on behalf of victims of terrorism, including the 1983, terrorist attack on the United States Marine Barracks sponsored and orchestrated by the Islamic Republic of Iran that resulted in death or injury to hundreds of U.S. Marines and other personnel.

### BACKGROUND

14.    Defendants Thomas Fay and Steven Perles were lead counsel for the plaintiffs in *Peterson v. Islamic Republic of Iran*, Case Nos. 01-cv-2094 (RCL), an action commenced by US Marine Barracks 1983 bombing victims and their relatives against

Iran. In early 2001, Attorneys Fay and Perles (previously solo practitioners who had worked on cases together in the past) formed a partnership known as Fay & Perles Law Firm or the FSIA Partnership. Fay and Perles Law firm has been dissolved and no longer exists, due in large part to disagreements between Fay and Perles, and each has returned to practicing independently with their own namesake law firms: Fay Law Group and Perles Law Firm. Shortly after Fay and Perles formed their 2001 partnership, they entered into an arrangement to work on the Peterson case with Allen Rothenberg and his firm called the Rothenberg Law Firm. About the same time in early 2001, Rothenberg engaged Delaney, who was a solo practitioner, to work as co-counsel on the Peterson case on a contingency fee basis with permission of both Fay and Perles.

15.     For approximately 10 months (February through October 2001), Delaney worked tirelessly to find and refer hundreds of plaintiffs in the *Peterson* case as well as provide legal research and writing. Delaney's work under her agreement came to a successful end in October, 2001 when the first of the Peterson complaints (with over 800 plaintiffs) was filed in the District of Columbia, with additional consolidated complaints adding new plaintiffs for the same cause of action filed after that date, totaling over 1400 plaintiffs. In 2003, the Court entered a default judgment against Iran in the Peterson action and directed that all damage claims be submitted to court-appointed special masters whose reports the Court would consider in determining each plaintiff's damages. (*Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 65 (D.D.C. 2003). This special master's process was orchestrated and controlled in large part by Fay & Perles. After the default judgment in 2003, Fay and Perles delegated their own assigned duties to "prove damages" to so-called "Associate Counsel" in exchange of 3% of collected legal fees,

and entered into boiler-plate agreements with about 15 of their relatives, friends, and business associates.

16.    On September 7, 2007, the Court awarded damages to the Peterson plaintiffs (*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 60-66 (D.D.C. 2007) But despite Delaney's work being completed in 2001, her payment was not due in 2001 nor at this time. Instead, Delaney's payment was due under the agreement when and to the extent that the judgment was collected upon. And the "truth is that the prospects for recovery upon judgments entered in these cases are extremely remote." *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 37 (D.D.C. 2009)

17.    Six more years passed with no significant developments in this case. Then, in 2016, The U.S. Supreme Court decided *Bank Markazi v. Peterson* 136 S. Ct. 1310 (2016), which made certain Iranian assets available to satisfy judgments against Iran, including both the Peterson judgment. On June 6, 2016, those assets were approved for distribution to the plaintiffs and their attorneys through a Qualified Settlement Fund. Delaney was never notified of the QSF by Fay, Perles nor Rothenberg, as required under their agreement. It was only in May 2017, upon reading an article in an obscure legal publication that Delaney first became aware that a QSF had been set up to distribute legal fees.

18.    On May 15, 2017 Delaney retained legal counsel and sent the QSF trustee a Notice of Claim for legal fees due and owing, which was also sent to the defendants. Delaney was notified by the counsel for the QSF that she was one of many attorneys disputing their legal fees with Fay, Perles and Rothenberg and was told that all legal fee payments had been stopped pending further investigation and participation of all parties

in informal mediation on a "Attorney Fee Dispute Track" moderated by Special Master Kathleen Massey, as appointed by Judge Katherine Forrest, Peterson "Turnover" action 1:10-cv-04519 SDNY.

19.     In June 2017, on a conference call with all attorneys participating in the QSF "Attorney Fee Dispute Track" and Special Master Massey, all three defendants refused to pay Delaney for her legal services and referrals. This was the first time Delaney was told by the defendants of their unequivocally refusal to pay for the services provided by Delaney.

20.     Under the 2001 agreement, Delaney would only be paid if and when the defendants themselves received their attorney's fees (which may have been never). Delaney provided services that did not result in tangible profits to the defendants for many years, and Delaney did not expect to be remunerated for her services until the defendants had themselves come into money. Delaney rendered her last services to the defendants in October 2001 thereby successfully completing her end of the bargain, and was told she would not be compensated for her services in June 2017. Since Delaney had completely performed her side of the contract and was just awaiting payment, she had no basis to declare a breach and sue for immediate payment, even if she had reason to doubt the defendants will pay when due. Any cause of action could not accrue until the defendants' performance under the contract came due. Payment was contingent and due upon collection and to the extent of collection only.

21.     In January 2001 Rothenberg was introduced by a mutual friend to Colleen Delaney. Rothenberg retained Delaney for her technology and organizational skills. Rothenberg told Delaney he was looking to partner with someone like her with her

specific skill set that included marketing, public relations and archive/internet research. Rothenberg told Delaney in a telephone conversation that he was investigating a very important case that could change her life as an attorney. About a week after their first conversation Rothenberg met Delaney in person at Houlihans Restaurant in Penn Station in New York City.

22.    At the meeting, Rothenberg explained that he was working on a case that would involve State Sponsored Terrorism Wrongful Death and personal injury claims under the Foreign Sovereign Immunities Act ("FSIA").[1] Rothenberg told Delaney the case he needed help with was the terrorist attack on the 1983 Marine Barracks in Beirut Lebanon.

23.    Without question, this litigation faced numerous challenges. The theory of liability  involved an entirely new area of law invoking the FSIA in which very few lawyers had any significant experience. Even more challenging was the task of identifying victims and their families,  a task that none of the defendants knew how to do. Delaney had expertise that would prove to be of critical importance in locating plaintiffs which is exactly why the defendants agreed to share the legal fees with Delaney

24.    During their February 2001 meeting Rothenberg acknowledged that neither he, Fay or Perles had retained any clients because there was no centralized public list of victims of the attack, survivors and their families

25.    In view of her vast experience with mining data from the internet, locating the victims and their families was something Delaney was uniquely qualified to do.

---

[1] The FSIA generally bars U.S. citizens from suing foreign governments in domestic courts except for circumstances including cases of terrorist acts, torture or hostage-taking by state sponsors of terrorism as designated by the State Department. Iran was on the State Department's list and engaged in all three activities at the time of the 1983 terrorist attack on the Marine Barracks.

26.    Delaney's expertise as above described has never been challenged by the defendants.

27.    By March of 2001 Rothenberg was so impressed with Delaney's work that he brought her on board as a member of the litigation team. Rothenberg Fay and Perles, orally agreed that she would be treated as a member of the litigation team.

28.    In exchange for her efforts, Delaney was orally promised the standard and customary fee of one-third of net attorneys' fees payable to Fay, Perles and Rothenberg in the *Peterson* and related cases.

29.    Beginning in March 2001, Delaney undertook significant work on behalf including locating the victims and their families in order to have them retained as plaintiffs.  Delaney's work as a member of the litigation team involved case management and legal research but, primarily, she was solely responsible for identifying and locating a large number of victims of the attack and their family members.

30.    Pursuant to the terms of the oral agreement with the defendants, Delaney reached out to hundreds of potential clients and the public at large as co-counsel, special counsel, and project manager via e-mail and correspondence.

31.    Emails with clients and counsel on which Rothenberg was copied were regularly exchanged and  never questioned or disputed Rothenberg.

32.    Although Fay Perles & Rothenberg refused to put the oral agreement in writing, they assured Delaney that they would keep their word.

33.    The oral agreement between Delaney and Fay, Perles and Rothenberg that Delaney would share in the legal fees collected in the *Peterson* and related cases was the sole inducement for Delaney to undertake the responsibility for locating plaintiffs.

34.     Delaney's contribution to the litigation is undisputed.  Through her efforts 1400 plaintiffs were retained by Fay Perles and Rothenberg under contingent fee agreements that called for Fay Perles and Rothenberg to receive 1/3 of the amount recovered for each plaintiff. This undisputed fact is all the more significant because Rothenberg imposed a nine-month deadline to find the victims and their families.

35.     Delaney's efforts are all the more remarkable given that the social media that we take for granted today, e.g., Facebook, Twitter etc. were in their infancy or did not exist at all. In the end, 87% of the plaintiffs eligible for payment from the $1.6 billion fund established to compensate the victims were retained by Fay, Perles and Rothenberg.

36.     The FSIA Partnership filed the *Peterson* actions in October and December 2001. The plaintiffs in the *Peterson* actions were family members of the 241 deceased servicemen and the injured survivors of the attack the majority of whom were located by Delaney.  The FSIA Partnership represented the plaintiffs who brought the actions in their own right, as administrators of the estates of the servicemen, and on behalf of the servicemen's heirs-at-law. All decedents and injured survivors of the attack were serving in the U.S. armed forces at the time of their injuries or death.

37.     Although Iran defendants were properly served with the *Peterson* actions under the FSIA, on May 6 and July 17, 2002, the defendants failed to file any response to either complaint, and on December 18, 2002, on motion by the FSIA Partnership, Judge Lamberth entered defaults against defendants in both cases.

38.     Despite the entries of default, Judge Lamberth was required under FSIA, before entering judgment, to make a further inquiry against the Iran defendants to establish the victims' "claim[s] or right[s] to relief by evidence that is satisfactory to the

Court." (28 U.S.C. § 1608(e). On March 17-18, 2003, Judge Lamberth conducted a bench

trial to determine the liability of the Iran for the attack. Judge Lamberth determined that

the plaintiffs established their right to obtain judicial relief against the Republic of Iran.

*Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003).

     39.     Between 2003 and and 2007 twenty Special Masters appointed by Judge

Lamberth conducted evidentiary hearings to determine damages and issued reports of

their findings for each of the plaintiffs.

     40.     Judge Lamberth conducted a hearing with respect to the Special Masters'

damages findings as to all of the *Peterson* plaintiffs on September 7, 2007 and entered

judgment totaling $2,656,944,877.00.[2]

     41.     Following the entry of Judge Lamberth's default judgment there was still

one more huge obstacle to overcome standing in the way of the plaintiffs' recovery:  How

to collect damages? [3]

     42.     Initially, collection attorneys were retained by the defendants and they

able to locate significant bond assets to satisfy the judgment being held in a New York

bank account at Citibank and claimed to be the property of Bank Markazi, the Central

---

[2] The Court of Appeals for the Second Circuit unanimously affirmed. *Peterson v. Islamic Republic of Iran,* 758 F.3d 185 (2014).

[3] Judge Lamberth was now required to interpret application of the FSIA to determine how the recovery would proceed. He ruled that the FSIA did not create a cause of action but rather was a pass through to substantive causes of action against private individuals that might exist in state federal or international law. As such, each plaintiff was now required to establish a valid cause of action under the law of the state of his or her domicile. *Peterson* 515 F.Supp 2d at 38. For example, certain of the Peterson plaintiffs had their actions dismissed because the jurisdictions where they were domiciled did not recognize causes of action for infliction of emotional distress (Pennsylvania and Kentucky). Others were dismissed for various reasons such as failure to present evidence or failure to establish that the plaintiffs were family members. As discussed *infra,* these plaintiffs were eventually allowed to renew their claims under an act of Congress.

Bank of Iran. Accordingly, sixteen groups of plaintiffs including the *Peterson* plaintiffs registered their default judgments under FRCP Rule 69 for turnover of approximately $1.75 billion. in the United States District Court for the Southern District of New York.[4] The turnover proceeding began in 2008 when the terrorism judgment holders in *Peterson* filed writs of execution and the District Court restrained the bonds.[5]

43.    SDNY District Court Judge Katherine Forrest entered a partial final judgment pursuant to Fed. R. Civ. P. 54(b) on July 9, 2013, awarding turnover of the sum of $1,895,600,513.03 plus interest ("Blocked Assets") by Citibank, N.A. to certain judgment creditors holding judgments against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MO IS"), who are identified as the "Plaintiffs" in said partial final judgment (the "Turnover Judgment").

44.    In addition to awarding the turnover of funds held by Citibank, N.A. Judge Forrest  created a trust for the benefit of the Plaintiffs (the "QSF") for the purpose of, receiving the turnover of the Blocked Assets; holding the Blocked Assets in accordance with the terms of that Order pending appeal of the Turnover Judgment; and distributing the Blocked Assets to the individual Plaintiffs in accordance with the terms of Plaintiffs' agreement concerning the distribution of those funds, as set forth in a written agreement

---

[4] See 28 U.S.C. § 1963: "A judgment ... may be registered ... in any other district.... A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."

[5] The impetus for the motion was the Executive Order signed by President Obama in 2012 declaring that "[a]ll property and interest" in property of Iran and held in the United States, were "blocked" under his authority pursuant to the International Emergency Economic Powers Act (IEEPA), 50 USC §1701Thus, as of February, 2012, any assets of Bank Markazi that were located in the United States became "blocked assets."

executed by counsel for the Plaintiffs dated as of June 1, 2012 entitled "Litigation Cooperation and Settlement Agreement" .[6]

45.     Judge Forrest appointed Retired Federal District Court Judge Stanley Sporkin D. D.C. Trustee of the QSF.

46.     Toward the end of 2017 and into early 2018 Judge Sporkin finally began partial distribution of some of the funds in the QSF.

47.     The *Peterson* plaintiffs as well as others were partially paid from the QSF and the defendants were paid a portion of their attorneys' fees totaling more than $150,000,000.

48.     Upon learning of the distribution of a portion of the attorney's fees Delaney demanded payment of her share of the fees based on her oral agreement.

49.     The defendants refused to honor the oral contract and refused Delaney's demand.

50.     In 2017 a flood of disputes arose amongst the attorneys representing the parties, including Fay Perles and Rothenberg, as well as attorneys who were retained for limited purposes (e.g. damage attorneys) by the attorneys of record for the *Peterson* actions and other actions. These disputes prevented further distribution because Judge Sporkin became concerned that there was not enough money to pay the plaintiffs and the attorneys. All told there were 20 attorneys making claims to share in the legal fees.

---

[6] Appeals and motions to enjoin the distributions to plaintiff from the QSF ensued and in 2016, the United States Supreme Court upheld a law allowing the *Petersen* plaintiffs who were victims of terrorism and their families to collect seized Iranian assets in the United States in the cases of relatives of marines and people killed or injured in the 1983 bombing of the U.S. Marine Corps barracks in Beirut. *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). [6]This led to the restraint of the so-called "Clearstream" assets totaling approximately $1.75 billion and upheld he establishment by Jidge Forrest of the Qualified Settlement Fund ("QSF"). [6]

51.    In 2017 Delaney moved to intervene in the proceedings in connection with the Turnover Judgment claiming that she possessed a lien against Fay, Perles and Rothenberg in the amount of $53.4 million pursuant to the oral agreement that she would receive a share of the total legal fees paid to The FSIA Partnership, Fay, Perles and Rothenberg.

52.    On June 7, 2017, Judge Forrest appointed Kathleen N. Massey as Special Master to "resolve a number of disputes concerning the QSF", one of which was the Attorneys' Fees Dispute track.

53.    On November 29, 2017 Special Master Massey in her report, addressed, among other claims, Delaney's attempt to intervene and her claimed lien on the legal fees paid to the defendants.

54.    Special Master Massey recommended that Delaney's motion to intervene be denied as untimely under FRCP 24(a) and 24(b) and that even if she were granted permission to intervene the court should find that she has not established her entitlement to a lien under the applicable law.

55.    Judge Forrest confirmed Special Master Massey's findings denying Delaney's motion to intervene in an Order dated June 18, 2018.

56.    The earliest date that Delaney's claim for breach of contract could have accrued is the first date that the contract was capable of being performed.

57.    The first date that the contract was capable of being performed was the first date that Trustee Sporkin was authorized to distribute funds distributed funds.

58.    The first day that Trustee Sporkin distributed monies from the QSF was within six years of the filing of this law suit.

## JURISDICTION AND VENUE

59.    Jurisdiction is claimed under 28 U.S.C. §1332(a) in that no defendant is a citizen of the same state as Plaintiff and the amount in controversy exceeds $75,000.00.

60.    Venue is proper in this district under 28 U.S.C. §1391(b) in that plaintiff is a citizen and domiciliary of the State of New York and a substantial portion of the acts giving rise to this claim occurred in the Southern District of New York.

61.    No defendant is a domiciliary of the State of New York

### PLAINTIFF DEMANDS A TRIAL BY JURY

62.    Plaintiff in this action demands a trial by jury on each and every one of her claims as pleaded herein.

### COUNT 1
### BREACH OF CONTRACT AGAINST ALL DEFENDANTS

63.    Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "62" of the complaint as if set forth fully and at length hereinafter. Plaintiff entered into an oral contract with the defendants in 2001 to work as a member of the litigation team providing investigative and  legal work for a one-third share of legal fees recovered paid to defendants in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured,  of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

## COUNT I
## BREACH OF CONTRACT AGAINST ALL PARTIES

64.     Plaintiff discharged her duties under the contract and fulfilled all of the agreed upon terms.

65.     The defendants were paid legal fees out of the Qualified Settlement Fund in 2016 totaling more than $150,000,000.

66.     When Plaintiff learned that the defendants were paid legal fees Plaintiff demanded payment of her share of the legal fees due and owing under the contract in the sum of $53,400,000.

67.     The defendants refused to pay plaintiff, and, as such, breached the terms of the oral contract.

68.     As a result of the aforesaid, the plaintiff has been damaged in the sum of $53,400,000.00

69.     The defendants are jointly and severally liable to the plaintiff.

## COUNT II
## BREACH OF CONTRACT AGAINST THOMAS FORTUNE FAY

70.     Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "68" of the complaint as if set forth fully and at length hereinafter.

71.     Plaintiff entered into an oral contract with the defendant THOMAS FORTUNE FAY in 2001 to work as a member of the litigation team providing investigative and  legal work for a one-third share of legal fees recovered  in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured,  of the 1983 terrorist

15

attack on the United States Marine Barracks in Beirut Lebanon.Plaintiff discharged her

duties under the contract and fulfilled all of the agreed upon terms.

72.    The defendant was paid legal fees out of the Qualified Settlement Fund in

2016.

73.    When Plaintiff learned that the defendant was paid legal fees she

demanded payment of her share of the legal fees due and owing under the contract.

74.    The defendant refused to pay plaintiff, and, as such, breached the terms of

the oral contract.

75.    As a result of the aforesaid breach of contract plaintiff has been damaged

in the sum of $53,400,000

76.    The defendant is liable to the plaintiff for the damages as aforesaid.


### COUNT III
### BREACH OF CONTRACT AGAINST FAY LAW GROUP P.C.

77.    Plaintiff repeats and reiterates each and every allegation in paragraphs "1"

through "76" of the complaint as if set forth fully and at length hereinafter.

78.    At all times hereinafter mentioned, FAY LAW GROUP, P.A. was a

professional association with offices located in Washington D.C.

79    At all times hereinafter mentioned, THOMAS FORTUNE FAY was a

shareholder in FAY LAW GROUP, P.A.

80    Plaintiff entered into an oral contract with the defendant FAY LAW

GROUP P.A. in 2001 to work as a member of the litigation team providing investigative

and  legal work for a one-third share of legal fees recovered  in connection with the

prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of

Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured, of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

81   Plaintiff discharged her duties under the contract and fulfilled all of the agreed upon terms.

82   The defendant was paid legal fees out of the Qualified Settlement Fund in 2016.

83   When plaintiff learned that the defendant was paid legal fees, Plaintiff demanded payment of her share of the legal fees due and owing under the contract.

84   The defendants refused to pay plaintiff, and, as such, breached the terms of the oral contract.

85   As a result of the aforesaid, the plaintiff has been damaged in the sum of $53,400,000.00.

## COUNT IV
## BREACH OF CONTRACT AGAINST STEVEN R. PERLES

86   Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "85" of the complaint as if set forth fully and at length hereinafter.

87   Plaintiff entered into an oral contract with the defendant STEVEN R. PERLES in 2001 to work as a member of the litigation team providing investigative and legal work for a one-third share of legal fees recovered in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured, of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

88      Plaintiff discharged her duties under the contract and fulfilled all of the agreed upon terms.

89      The defendant was paid legal fees out of the Qualified Settlement Fund in 2016.

90      When plaintiff learned that the defendant was paid legal fees, Plaintiff demanded payment of her share of the legal fees due and owing under the contract.

91      The defendants refused to pay plaintiff, and, as such, breached the terms of the oral contract.

92      As a result of the aforesaid, the plaintiff has been damaged in the sum of $53,400,000.00.

## COUNT V
## BREACH OF CONTRACT AGAINST PERLES LAW GROUP, P.C.

93.     Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "92" of the complaint as if set forth fully and at length hereinafter.

94.     Plaintiff entered into an oral contract with the defendant PERLES LAW GROUP, P.C. in 2001 to work as a member of the litigation team providing investigative and legal work for a one-third share of legal fees recovered in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured, of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

95.     STEVEN R. PERLES was a shareholder in PERLES LAW GROUP, P.C.

96.     Plaintiff discharged her duties under the contract and fulfilled all of the agreed upon terms.

97.     The defendant was paid legal fees out of the Qualified Settlement Fund in 2016.

98     When Plaintiff found out that the defendant was paid legal fees Plaintiff demanded payment of her share of the legal fees.

99     The defendant refused to pay plaintiff and, as such, has breached the terms of the oral contract.

100     As a result of the aforesaid, the plaintiff has been damaged in the sum of $53,400.00.

## COUNT VI
## BREACH OF CONTRACT AGAINST ALLEN L. ROTHENBERG

101     Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "100" of the complaint as if set forth fully and at length hereinafter.

102     Plaintiff entered into an oral contract with the defendant ALLEN L. ROTHENBERG in 2001 to work as a member of the litigation team providing investigative and  legal work for a one-third share of legal fees recovered  in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured,  of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

103     Plaintiff discharged her duties under the contract and fulfilled all of the agreed upon terms.

104     The defendant was paid legal fees out of the Qualified Settlement Fund in 2016.

105    When Plaintiff found out that the defendant was paid legal fees Plaintiff demanded payment of her share of the legal fees.

106    The defendant refused to pay plaintiff and, as such, has breached the terms of the oral contract.

107    As a result of the aforesaid, the plaintiff has been damaged in the sum of $53,400.00.

## COUNT VII
## BREACH OF CONTRACT AGAINST ROTHENBERG LAW FIRM, LLP

108    Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "107" of the complaint as if set forth fully and at length hereinafter

109    Plaintiff entered into an oral contract with the defendant ROTHENBERG LAW FIRM, LLP in 2001 to work as a member of the litigation team providing investigative and legal work for a one-third share of legal fees recovered in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured, of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

110    ALLEN L. ROTHENBERG was a shareholder in ALLEN L, ROTHENBERG, LLP.

111    Plaintiff discharged her duties under the contract and fulfilled all of the agreed upon terms.

112    The defendant was paid legal fees out of the Qualified Settlement Fund in 2016.

113    When Plaintiff found out that the defendant was paid legal fees Plaintiff demanded payment of her share of the legal fees.

114    The defendant refused to pay plaintiff and, as such, has breached the terms of the oral contract.

115    As a result of the aforesaid, the plaintiff has been damaged in the sum of $53,400.00.

**COUNT VIII**
**BREACH OF CONTRACT AGAINST**
**FAY AND PERLES FSIA LITIGATION PARTNERSHIP**

116    Plaintiff repeats and reiterates each and every allegation in the paragraphs of the complaint numbered "1" through "115" as if set forth fully and at length hereinafter.

117    FAY AND PERLES FSIA LITIGATION PARTNERSHIP was formed by FAY and PERLES to carry out the litigation that plaintiff was initially hired to work on and was therefore obligated to honor the contract entered into by FAY, PERLES, ROTHENBERG individually and on behalf of their respective professional entities.

118    Plaintiff entered into an oral contract with the defendant FAY, PERLES and ROTHENBERG in 2001 to work as a member of the litigation team providing investigative and legal work for a one-third share of legal fees recovered in connection with the prosecution of various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages suffered by families and individual victims, deceased and injured, of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

119    Sometime thereafter, Fay and Perles formed FAY AND PERLES FSIA LITIGATION PARTNERSHIP.

120     Plaintiff was assured repeatedly that FAY AND PERLES FSIA LITIGATION PARTNERSHIP would honor the contract to pay her a share of the attorneys' fees collected from the Qualified Settlement Fund.

121     Upon information and belief the defendant FAY AND PERLES FSIA LITIGATION PARTNERSHIP was paid legal fees out of the Qualified Settlement Fund in 2016.

122     When plaintiff found out in 2016 that the defendant might be receiving legal fees from the Qualified Settlement Fund, she demanded payment of her share of the legal fees pursuant to the oral contract entered into in 2001 to share in legal fees.

123     The defendant refused to pay plaintiff and, as such, has breached the oral contract.

124     The defendant's refusal to pay Plaintiff her share of the more than $150,000,000 that were paid to Fay, Perles and Rothenberg was a breach of the oral agreement entered into by FAY, PERLES and ROTHENBERG with Plaintiff in 2001.

125     As a result of the aforesaid plaintiff has been damaged in the sum of $53,400,000.

## COUNT IX
## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

126     The plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "125" of the complaint as if set forth fully and at length hereinafter.

127     The defendants have been enriched by the legal services provided by the plaintiff in the prosecution of the various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran for damages

suffered by families and individual victims, deceased and injured, of the 1983 terrorist attack on the United States Marine Barracks in Beirut Lebanon.

128     The defendant have been enriched as aforesaid at the expense of the plaintiff who performed substantial legal services enabling the defendants to successfully litigate various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran as aforesaid.

129     It would be against equity and good conscience to permit the defendants to retain plaintiff's share of the net legal fees obtained in the settlement of the various lawsuits against the Islamic Republic of Iran and the Ministry of Intelligence and Security of the Islamic Republic of Iran as aforesaid.

130     As a result of the aforesaid, the defendants have been unjustly enriched.

131     As a result of the aforesaid plaintiff is entitled to recover against the defendants, at a minimum, in the sum of $53,400,000.

## COUNT X
## CONSTRUCTIVE TRUST AGAINST ALL DEFENDANTS

132     Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "131" of the complaint as if set forth fully and at length hereinafter.

133     As a result of the settlement of the various lawsuits as aforesaid and the collection of attorneys' fees in consequence thereof a fiduciary relationship existed between plaintiff and the defendants jointly and severally.

134     The defendants promised to pay plaintiff a portion of the legal fees obtained in the various lawsuits as aforesaid.

135    A transfer of monies occurred at the time the defendants were paid legal fees from the QSF in settlement of the various lawsuits as aforesaid, a portion of which were owed to plaintiff for the legal services she performed.

136    Plaintiff authorized the defendants to collect her share of the legal fees based upon the fiduciary relationship that existed between plaintiff and defendants.

137    Plaintiff had a good faith belief that upon collection of the legal fees in the various lawsuits she would be paid.

138    The defendant collected legal fees totaling more than $150,000,000 including the share of such fees owed to plaintiff.

139    The moment the defendants obtained and collected plaintiff's share of the legal fees a constructive trust existed.

140    By refusing to pay plaintiff her promised share of the legal fees collected, the defendants have breached their fiduciary duty as trustees of the constructive trust.

141    As a result of the breach of their fiduciary duty plaintiff has been damaged in the sum of $53,400,000.

### COUNT XI
### CONSTRUCTIVE TRUST AGAINST ALLEN L. ROTHENBERG
### AND THE ROTHENBERG LAW FIRM, LLP.

142    Plaintiff repeats and reiterates each and every allegation in paragraphs "1" through "141" of the complaint as if set forth fully and at length hereinafter.

143    As a result of the settlement of the various lawsuits as aforesaid and the collection of attorneys' fees in consequence thereof, a fiduciary relationship existed between plaintiff and ALLEN L. ROTHENBERG.

144    Plaintiff had a good faith basis to believe that the defendant ALLEN L. ROTHENBERG would hold her share of the legal fees to which she was entitled and pay her.

145    ALLEN L. ROTHENBERG individually and on behalf of THE ROTHENBERG LAW FIRM, LLP promised to pay plaintiff a portion of the legal fees obtained from the QSF in settlement of the various lawsuits as aforesaid.

146    A transfer of monies from the QSF in payment of legal fees, a portion of which included plaintiff's share of such legal fees, was paid to the defendant ALLEN L. ROTHENBERG individually and on behalf of THE ROTHENBERG LAW FIRM, LLP.

147    It was understood between plaintiff and defendant ALLEN L. ROTHENBERG that the monies so transferred included plaintiff's share of the legal fees and plaintiff agreed that the defendant ALLEN L. ROTHENBERG would collect such monies and pay plaintiff her share.

148    The moment the defendant ALLEN L. ROTHENBERG and THE ROTHENBERG LAW FIRM came into possession of the legal fees paid from the QSF in settlement of the various lawsuits, a constructive trust was created for the benefit of plaintiff.

149    The defendant ALLEN L. ROTHENBERG, individually and on behalf of THE ROTHENBERG LAW FIRM, LLP refused to pay plaintiff her share of the monies received from the QSF as legal fees paid in connection with the settlement of the various lawsuits referred to herein above.

150    When the defendant ALLEN L. ROTHENBERG individually and on behalf of THE ROTHENBERG LAW FIRM, LLP refused to pay plaintiff her share of the legal

fees paid from the QSF to the defendant he breached his fiduciary duty to plaintiff under the constructive trust that was created when the legal fees from the QSF were received.

151    As a result of the aforesaid, plaintiff has been damaged in the sum of $53,400,000.

**COUNT XI**
**QUASI CONTRACT AGAINST ALL DEFENDANTS**

152    Plaintiff repeat and reiterate each and every response to the allegations in paragraphs "1" through "151" of the complaint as if set forth fully and at length hereinafter.

153    Plaintiff performed substantial legal services in furtherance of the prosecution of the various cases that led to the establishment of the QSF.

154    The defendants benefitted from the legal services performed by plaintiff, in particular, locating the vast majority of plaintiffs who retained the various defendants to prosecute claims against The Islamic Republic of Iran and The Ministry of Intelligence and Security of the Islamic Republic of Iran that led to the establishment of the QSF that resulted in the payment of attorneys' fees to the defendants including the plaintiff's promised share of such legal fees.

155    Plaintiff's efforts, work and legal services in connection with the successful prosecution of the various lawsuits against The Islamic Republic of Iran and The Ministry of Intelligence and Security of the Islamic Republic of Iran and the establishment of the QSF is consistent with a contractual relationship between plaintiff and defendants.

156    By not paying plaintiff a share of the legal fees obtained from the QSF, the defendants have breached the aforesaid contractual relationship that existed as a matter of equity and law between the defendants and plaintiff.

157     As a result of the aforesaid, plaintiff has been damaged in the amount of $53,400,000.

## COUNT XII
## FRAUD AGAINST ALLEN. L. ROTHENBERG

158     Plaintiff repeats and reiterates each and every allegation of the complaint in the paragraphs numbered "1" through 157" as if set forth fully and at length hereinafter.

159     Prior to entering into the agreement to join the team representing plaintiffs in the various cases filed against The Islamic Republic of Iran and The Ministry of Intelligence and Security of the Islamic Republic of Iran (the "Cases") as aforesaid, plaintiff had a professional relationship with the defendant ALLEN L. ROTHENBREG.

160     Prior to promising to pay plaintiff one-third of the legal fees in exchange for plaintiff agreeing to perform legal work in connection with prosecuting the "Cases" ALLEN L. ROTHENBERG stated to plaintiff: "I am about to become involved in a lawsuit that will change your career as an attorney if you agree to work with me".

161     When the defendant offered and/or promised to offer plaintiff an affiliation with his firm that would change her career no terms of her compensation were discussed and there was, as yet, no promise to pay plaintiff.

162     Defendant's promise to offer plaintiff a position that would change her career as described above was a material misrepresentation that was relied on by plaintiff in ultimately agreeing to work on the "Cases" for the defendant ALLEN L. ROTHENBERG.

163     The promise to offer plaintiff an opportunity to "change her career as an attorney" was antecedent to and distinct from the promise to pay plaintiff.

164    The purpose of the antecedent and distinct promise was to induce plaintiff to work for the defendant on the "Cases".

165    Sometime after the material misrepresentation was made, the defendant promised to pay plaintiff one third of the legal fees recovered in the "Cases".

166    Plaintiff agreed to work with the defendant on the "Cases" for one-third of the legal fees recovered.

167    The defendant's promise that if she agreed to work on the cases it would change plaintiff's career was an inducement to plaintiff's agreeing to work with the defendant and eventually to accept one third of the legal fees in exchange for all the work she performed.

168    The defendant's misrepresentation of a material fact induced plaintiff to work on the "Cases"

169    The defendant never intended to pay plaintiff for the work she performed on the "Cases".

170    As a result of the aforesaid, the plaintiff has been damaged, at a minimum, in the sum of $53,400,000.

**COUNT XIII**
**PROMISSORY ESTOPPEL AGAINST ALL DEFENDANTS**

171    Plaintiff repeats and reiterates each and every allegation of the complaint in the paragraphs numbered "1" through "170" as if set forth fully and at length herein.

172    The defendants agreed to compensate plaintiff for performing legal work on behalf of plaintiffs in the various cases filed against The Islamic Republic of Iran and The Ministry of Intelligence and Security of the Islamic Republic of Iran for their role in the bombing of the United States Marine barracks in Beirut Lebanon (the "Cases").

28

173    The defendants orally agreed to pay plaintiff one-third of the legal fees recovered in the "Cases".

174    The defendants obtained a judgment on default against the Islamic Republic of Iran that was ultimately enforced for money damages that was paid leading to the establishment of the QSF from which the defendants herein were paid legal fees.

175    The defendants have refused to pay plaintiff.

176    Plaintiff performed all of the legal work that she was asked to leading to the at least 811 plaintiffs retaining the defendant attorneys to represent them in the "Cases'.

177    There is no dispute that plaintiff performed her obligations under the oral agreement and that defendants benefitted from the work she performed.

178    The defendants were paid legal fees from the QSF bur have refused to pay plaintiff what she is owed under the oral agreement obligating the defendants to pay plaintiff one third of the fees they obtained.

179    By discharging her duties to perform legal services under the oral agreement plaintiff has relied on the defendants' promise to pay to her detriment.

180    The defendants' promise to pay plaintiff is apparent from the work she performed and the benefit of the work to the defendants.

181    Plaintiff never agreed to work for the defendants without compensation.

182    The defendants knew that plaintiff would perform legal services in support of the prosecution of the "Casers" based on their representation that she would receive a portion of the legal fees.

29

183    The defendants knew they did not intend to honor the agreement to pay plaintiff a portion of the legal fees obtained and knew that such representation was false when it was made.

184    Plaintiff's reliance on the defendants promise to pay is implicit in the work she performed, without which there would have been no plaintiffs on whose behalf the defendants brought the cases against The Islamic Republic of Iran and The Ministry of Intelligence and Security of the Islamic Republic of Iran.

185    On the basis of the aforesaid, the defendants are estopped from denying the existence of an agreement to pay plaintiff one third of the legal fees obtained from the QSF in settlement of the "Cases" that were brought as a direct result plaintiff's efforts and legal work.

186    The defendant are now estopped from claiming that plaintiff did not perform the work she was hired to do.

187    The defendant are now estopped from denying plaintiff is entitled to one-third of the legal fees obtained from the QSF.

188    As a result of the aforesaid, plaintiff has been damaged and is entitled to $53,400,000.

## VIX
## RELEIF REQUESTED

**WHEREFORE,** Plaintiff respectfully requests Judgment on Counts I through VIII complaint:

> a.  Against the defendants holding them jointly and severally liable to the plaintiff for breaching their oral agreement to share in attorney's fees with plaintiff in the lawsuits that were commenced by the defendants to compensate the living victims and families of deceased victims of the 1983 State Sponsored terrorist attack on

the United States Marine barracks in Beirut Lebanon in the United States District Court for the District of Columbia.

b.  Awarding monetary damages for breach of contract, alternatively for unjust enrichment, alternatively for relief on the ground of quasi contract, alternatively for promissory estoppel, against the defendants jointly and severally in the sum of $53,400,000.00 for her share of attorneys' fees plus interest.

Dated: New York, NY
       May 7, 2019

                                        Yours etc.
                                        PULVERS PULVERS & THOMPSPON, LLP

                                        MARC R. THOMPSON
                                        950 Third Avenue 11th Floor
                                        New York, NY 10022
                                        (212) 308-0210
                                        Mthompson@pulversthompson.com

31